### In re MORTON BOARDING STABLES.

(District Court, S. D. New York. May 17, 1901.)

BANKRUPTCY—CORPORATION—CONDUCTING BOARDING STABLES.

A corporation, the principal business of which is conducting boarding stables wherein it boards horses for its customers, including the complete care of them and also the care of wagons and carriages, harness, etc., is engaged principally in "trading or mercantile pursuits" within

the meaning of Bankr. Act 1898, § 4b, and may be adjudged an involuntary bankrupt.

## In Bankruptcy.

On motion to set aside an adjudication in bankruptcy. An order of reference was made to ascertain the facts, with the referee's opinion thereon: The following is the report of the referee, with his opinion:

I, Ernest Hall, the referee in said order named, do respectfully report: That I have been attended upon said reference by the officers of said alleged bankrupt corporation and its counsel, and by counsel for the petitioning creditors, and other parties in interest, and that I have taken the proof offered by the respective parties and have heard argument of counsel thereon, and after due deliberation, I do find and report, that at the time of filing the petition herein the alleged bankrupt, the Morton Boarding Stables, was a corporation engaged principally in trading and mercantile pursuits, within the meaning of section 4b of the bankrupt act, and could lawfully be adjudged an involuntary bankrupt thereunder.

The facts in the case are practically undisputed, and are substantially as follows: The corporation hired and rented a large building in the city of New York, and had it suitably arranged for the accommodation of horses and trucks or wagons and for the storage of necessary food and bedding for horses, and they also had a blacksmith's establishment and repair shop for trucks and wagons, which were operated in connection with the stable. They took horses to board for a certain specified sum per month, which sum included the storage of the trucks or wagons, and the cleaning and greasing of the same. They also shod the horses and, to a small extent, did outside shoeing and also a small business in repairs to trucks, but all of the matters outside of the board of the horses may be considered as mere adjuncts or accessories of the main business of boarding horses for hire; and the income from all other sources formed but a small and unimportant part of the entire income from the business. It may also be remarked, in passing, that they occasionally bought, sold, or exchanged horses and also let their own horses to their customers, when those of the latter were out of condition for work.

They had many incidental branches to their business and it became necessary for them to buy and sell different articles, and, perhaps, manufacture to a small extent; and it might be possible to find that in these different branches they were traders or were following mercantile pursuits within the meaning of the act, but it can scarcely be said that in this regard they were engaged principally in trading or mercantile pursuits, and I prefer to rest my decision squarely upon the fact that in boarding horses for hire and carrying on a livery stable, they were principally engaged in trading and mercantile pursuits.

I consider the case In re Odell, 17 N. B. R. 73, Fed. Cas. No. 10,426, decided by Judge Blatchford, under the old bankruptcy law, as a direct authority in this case, and that it is well reasoned and ought to control.

Subdivision 7, § 5110, Rev. St., provided that no discharge should be granted to a bankrupt, if being a merchant or tradesman he had not kept proper books of account.

The bankrupts in that case kept a livery stable and took horses for board at a certain specified price per month, and they also let their own horses and bought horses for their own use in the business and for hiring out.

"They fed the horses with hay, oats, feed and grain, buying such food and receiving pay for that which the horses consumed; this was as much a sale of the food as if it had been sold to be taken away from the premises and consumed by the horses of other persons elsewhere. The only difference is that it was sold to be consumed on the premises by the horses of other persons."

This language is more directly in point in the case at bar than it was in the Odell Case, because in that case the bankrupts kept a regular livery

stable and their principal business seems to have been the hiring out of their own horses and carriages for pay, and incidentally boarding the horses of other persons; while in the case at bar the chief business was the boarding of horses belonging to other persons.

Much stress has been laid by the counsel for the moving party upon the fact that the rent of the stable and the attendance upon the horses by the employés of the bankrupts furnished a large part of the service for which they received the monthly pay. If such an argument were controlling there could be no trading or mercantile business within the meaning of the act; every merchant or trader must have a place of business and own it or pay rent for it, and he must have employés and salesmen to handle and sell his goods, and horses, and trucks, perhaps, to deliver them, and in many mercantile businesses the handling and delivery of the goods constitutes the chief expense, as in buying ice or coal by the cargo and retailing it; the same may be said of almost any business of buying and selling.

The bankrupt bought grain and feed of all kinds in large quantities, and sold it again at retail to its customers, and instead of delivering it to them in bulk to be used at their own stables, they divided it up into the necessary quantities and sold it to their customers to be consumed on the premises. Suppose they had furnished eight quarts of oats to a customer for so much a quart, and the customer had put it in the manger and fed it to his horse, and had continued the same performance for a month, and then paid the agreed price, can there be any doubt but that it would constitute a sale? But the moving party claims that because an employé put it in the manger it became something else than a sale, but he fails to disclose what the transaction would then have been, nor does the fact that the wages of the employé formed an indivisible part of the monthly sum charged, alter the case or make it any less a sale; the employé delivers the goods purchased to be consumed upon the premises instead of somewhere else. I fail to discover any distinction.

Counsel for the moving party cites in support of his argument the case of In re New York & W. Water Co. (recently decided by this court) 98 Fed. 711, in which it was held that a company which owned a source of water supply and a reservoir and pipe lines and allowed householders for a certain sum to connect their houses with its pipes and thus obtain a water supply, was not principally engaged in trading or mercantile pursuits under the act.

The reasoning of that case seems perfect, but it has no application here. That company did not buy and sell water in specific quantities, but merely conveyed the water through their own pipes or conduits from a natural supply, and for a certain annual payment licensed householders to connect with their pipes and thus obtain necessary quantities of water.

But, suppose that company had been formed for the purpose of purchasing spring water in bulk and then bottling it and selling it at retail; can there be any doubt but that they would have been traders and engaged in mercantile pursuits, even though the original cost of the water might have been but trifling and the labor of transporting and bottling and delivering it have been the chief item of cost?

Or, go further and suppose they opened a store (as many of them have) and in order to introduce their goods had agreed that any one might go in and be served with as much of the water as they could drink every day for a certain price per month, would not that also have been trading?

The cases referred to by the learned counsel for the moving party, relating to mining companies, have no application to the case at bar; they stand upon the same footing as the Water Co. Case.

The case of In re San Gabriel Sanatorium (D. C.) 95 Fed. 271, decided under the present law, goes much further in support of the petitioning creditors' contention than the Odell Case, and is certainly not an authority in favor of the moving party.

My conclusion is that the adjudication in this case was clearly within the provisions of the bankruptcy act.

I submit herewith the order of reference and all the testimony taken before me.

Jacob A. Cantor, for petitioning creditors.

Henry G. Sanford, opposed.

BROWN, District Judge. The principal business of this corporation being evidently that of boarding horses for their customers, including the complete care of them, and also the care of wagons, harness, coaches, etc., I should have hesitated, if this were an original question, to consider this corporation as principally engaged in "trading or commercial pursuits" within section 4b of the bankruptcy act, as the business does not involve, except to a very minor degree, any direct sale of the hay, feed, grain, etc. In re New York & W. Water Co. (D. C.) 98 Fed. 711, 713, 714, 3 Am. Bankr. R. 508; In re Elk Park Min. & Mill. Co. (D. C.) 101 Fed. 422; In re Rollins Gold & Silver Min. Co. (D. C.) 102 Fed. 982, 4 Am. Bankr. R. 327. But in construing the phrases of the act of 1898, reference is constantly made to the preceding bankruptcy acts and to the construction given to similar phrases therein used. In the Case of Odell, 17 N. B. R. 73, Fed. Cas. No. 10,426, in this district, Mr. Justice Blatchford construed the words "merchant or tradesman" in the act of 1867, as including livery stable keepers, considering that the purchase and supply of hay, oats, feed and grain (which are the principal items in this business), and receiving pay therefor in the compensation paid for the board of horses, was equivalent to a sale of the food and constituted "trading." This is no doubt a somewhat liberal construction of the word trading; but as this was the established construction under the former act and has, so far as I know, never been dissented from, and as the business is in general so closely allied and analogous to trading or commercial pursuits, I think I should follow the former construction as the learned referee has done, and confirm his report, leaving to the contestants the burden of any review by appeal, should that be desired.

The report is confirmed.